Elizabeth N. Pendleton
Commodity Futures Trading Commission
Illinois Bar No. 6282050
525 West Monroe Street, Suite 1100
Chicago, Illinois 60661
Phone: (312) 596-0629
Facsimile: (312) 596-0714
Email: ependleton@cftc.gov

Blaine T. Welsh
Assistant United States Attorney
Nevada Bar No. 4790
333 Las Vegas Boulevard South, Suite 5000
Las Vegas, Nevada 89101
Phone: (702) 388-6336
Facsimile: (702) 388-6787
Email: Blaine.Welsh@usdoj.gov

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| **U. S. COMMODITY FUTURES TRADING COMMISSION,** | |
| **Plaintiff,** | **Civil Action No:** _____ |
| **vs.** | |
| **CIS COMMODITIES LLC, ALLEN NICHOLAS WARD, TRANS GLOBAL INVESTMENTS, LLC and CHARLES LEROY TIMBERLAKE,** | **Hon.**_____ |
| **Defendants.** | |

## COMPLAINT FOR INJUNCTIVE AND OTHER EQUITABLE RELIEF AND PENALTIES UNDER THE COMMODITY EXCHANGE ACT, AS AMENDED

The United States Commodity Futures Trading Commission (the "Commission" or the "CFTC"), by and through its attorneys, alleges as follows:

## I.     JURISDICTION AND VENUE

1.      This Court has jurisdiction over this action pursuant to the Commodity Exchange

Act (the "Act"), as amended by the Food, Conservation, and Energy Act of 2008, Pub. L. No.

110-246, Title XIII (the CFTC Reauthorization Act of 2008 ("CRA")), §§ 13101-13204, 122

Stat. 1651 (enacted June 18, 2008) and the Dodd-Frank Wall Street Reform and Consumer

Protection Act of 2010, Pub. L. No. 111-203 ("Dodd-Frank Act"), Title VII (the Wall Street

Transparency and Accountability Act of 2010), §§701-774, 124 Stat. 1376 (enacted July 21,

2010) to be codified at 7 U.S.C. §§ 1 *et seq.*  This Court also has jurisdiction over the subject

matter of this action and the defendants pursuant to Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a)

(2006), which authorizes the Commission to seek injunctive relief against any person whenever

it shall appear that such person has engaged, is engaging, or is about to engage in any act or

practice constituting a violation of any provision of the Act or any rule, regulation, or order

thereunder.

2.      Venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C.

§ 13a-1(e) (2006), in that defendants are found in, inhabit and/or transact or have transacted

business in this District, and defendants' acts and practices in violation of this Act have occurred,

are occurring, and/or are about to occur within this District, among other places.

## II.     SUMMARY

3.      Beginning in or about November 2006 and continuing through at least February

2009, defendant CIS Commodities LLC ("CIS"), through its sole founder, officer and operator

defendant Allen Nicholas Ward ("Ward"), solicited money from individuals for the purpose of

trading commodity futures contracts ("futures") and options on commodity futures contracts

("options").  CIS introduced some customer accounts to a futures commission merchant ("FCM").  However, Ward also solicited and accepted at least $180,648, representing $115,648 from two CIS customers and at least $65,000 from a commodity pool operated by defendant Trans Global Investments, LLC ("Trans Global"), at least $175,500 of which he misappropriated and used for CIS's operating costs and legal expenses, and for personal uses such as automobile expenses, residential rent, meals and entertainment.  Additionally, Ward willfully made false representations of material facts to certain CIS customers and issued false statements to at least one CIS customer regarding the profitability and value of her investment.

4.      Beginning in or about March 2007 and continuing through the present, Ward also associated himself with defendant Trans Global, an unregistered commodity pool operator ("CPO").  Trans Global, through its founder and president defendant Charles Leroy Timberlake ("Timberlake"), and Ward fraudulently solicited at least $220,000 from at least five individuals for the purpose of trading commodity futures and option contracts through participation in a commodity pool ("Trans Global pool").  Timberlake gave at least $65,000 of pool funds to Ward, who in turn misappropriated those funds by using them for CIS's operating costs and legal expenses, and for personal uses such as automobile expenses, residential rent, meals and entertainment.  Additionally, defendants Timberlake and Ward willfully made false representations of material facts and issued false statements to Trans Global pool participants regarding the profitability and value of their investments.

5.      By this conduct, defendants have engaged, are engaging, or are about to engage in acts and practices that violate provisions of Act, as amended, to be codified at 7 U.S.C. §§ 1 *et*

*seq.*, and the Commission's Regulations (the "Regulations") promulgated thereunder, 17 C.F.R.

§§ 1.1 *et seq.* (2011).

6.     Unless restrained and enjoined by this Court, defendants are likely to continue to

engage in the acts and practices alleged in this complaint, or in similar acts and practices.

7.     Accordingly, the CFTC brings this action pursuant to Section 6c of the Act,

7 U.S.C. § 13a-1 (2006), to enjoin defendants' unlawful acts and practices and to compel their

compliance with the Act and the Regulations.  In addition, the Commission seeks restitution,

civil monetary penalties, and such other equitable relief as this Court may deem necessary and

appropriate.

### III.     PARTIES

8.     The **U.S. Commodity Futures Trading Commission** is an independent federal

regulatory agency charged by Congress with the responsibility for administering and enforcing

the provisions of the Act, as amended, to be codified at 7 U.S.C. §§ 1 *et seq.*, and the Regulations

promulgated thereunder, 17 C.F.R. §§ 1.1 *et seq.* (2011).

9.     From October 2006 through October 2009, when its LLC status was revoked,

defendant **CIS Commodities LLC** was a Nevada limited liability company with its main office

located in Henderson, Nevada.  CIS was registered with the Commission as an introducing

broker ("IB") between January 3, 2007 and February 1, 2009, at which time CIS withdrew its IB

registration.

10.     Defendant **Trans Global Investments, LLC** is and was at all relevant times a

Nevada limited liability company.  Trans Global has operated the Trans Global pool, a

commodity pool engaged in the speculative trading of commodity futures, from at least March

2007 through the present. Trans Global filed for an exemption from registration with the

Commission pursuant to Regulation 4.13(a)(2), 17 C.F.R. § 4.13(a)(2) (2011), which generally

exempts from registration with the Commission operators of pools with no more than 15

participants at any given time and total gross capital contributions, in aggregate, do not exceed

$400,000.

11.     Upon information and belief, defendant **Allen Nicholas Ward** currently resides in

Aspen, Colorado. He previously resided in Henderson, Nevada. Ward was, at all relevant times,

the sole officer and manager of CIS. Ward was registered with the Commission as an associated

person ("AP") of CIS from January 3, 2007 through January 2, 2009. He also acted as an AP

and agent of Trans Global, and shared responsibility for the solicitation of pool participants and

management of Trans Global's trading accounts.

12.     Defendant **Charles Leroy Timberlake** resides in Plano, Texas and is employed

as a cargo pilot. Timberlake has never been registered with the Commission in any capacity.

Timberlake is and was at all relevant times Trans Global's president and investment manager.

He was responsible for Trans Global's solicitation of pool participants, opening and maintenance

of Trans Global's bank account, and management and control of Trans Global's trading

accounts.

## IV.     STATUTORY BACKGROUND

13.     A futures commission merchant or "FCM" is defined in Section 1a(20) of the Act,

7 U.S.C. § 1a(20) (2006), as any individual, association, partnership, corporation or trust that is

engaged in soliciting or accepting orders for the purchase or sale of any commodity for future

delivery and, "in or in connection with such solicitation or acceptance of orders, accepts any

money, securities or property (or extends credit in lieu thereof) to margin, guarantee, or secure any trades or contracts that result or may result therefrom."

14.     An introducing broker or "IB" is defined in Section 1a(23) of the Act, 7 U.S.C. § 1a(23) (2006), as any person, other than an FCM, "engaged in soliciting or in accepting orders for the purchase or sale of any commodity for future delivery on or subject to the rules of any contract market . . . who does not accept any money, securities, or property (or extend credit in lieu thereof) to margin, guarantee, or secure any trades or contracts that result or that may result therefrom."

15.     A "commodity pool" is defined in Regulation 4.10(d)(1), 17 C.F.R. § 4.10(d)(1) (2011), as "any investment trust, syndicate or similar form of enterprise operated for the purpose of trading commodity interests."

16.     A "commodity pool operator" or "CPO" is defined in Section 1a(5) of the Act, 7 U.S.C. § 1a(5) (2006), as:

> any person engaged in a business that is of the nature of an investment trust, syndicate, or similar form of enterprise, and who, in connection therewith, solicits, accepts or receives from others, funds, securities, or property, either directly or through capital contributions, the sale of stock or other forms of securities, or otherwise, for the purpose of trading in any commodity for future delivery on or subject to the rules of any contract market or derivatives transaction execution facility.

17.     An "associated person" or "AP" of a CPO is defined in Regulation 1.3(aa)(3), 17 C.F.R. § 1.3(aa)(3) (2011), as any natural person who is associated with a CPO "as a partner, officer, employee, consultant or agent (or any natural person occupying a similar status or performing similar functions), in any capacity which involves (i) the solicitation of funds,

securities, or property for a participation in a commodity pool or (ii) the supervision of any person or persons so engaged."

18.    A "commodity trading advisor" or "CTA" is defined in Section 1a(6)(A) of the Act, 7 U.S.C. § 1a(6)(A) (2006), as any person who, "for compensation or profit, engages in the business of advising others . . . as to the value or the advisability of" trading in any commodity futures and options contract.

19.    A "participant" is defined in Regulation 4.10(c), 17 C.F.R. § 4.10(c) (2011), as "any person that has any direct financial interest" in a commodity pool.

## V.    DEFENDANTS' VARIOUS FRAUDULENT ACTIVITIES

### A.    The CIS Investment Enterprise and Solicitation of Customers

20.    From approximately November 2006 through at least February 2009, CIS, through its agent Ward, solicited members of the general public to trade commodity futures contracts.

21.    On November 1, 2006, Ward opened a bank account in the name of CIS with Washington Mutual Bank ("WaMu").  Ward has at all relevant times maintained exclusive control over the WaMu account.

22.    On or around November 24, 2006, CIS, through its agent Ward, entered into a Clearing Agreement for Guaranteed Introducing Brokers (the "Clearing Agreement") with Peregrine Financial Group, Inc. ("Peregrine"), a registered FCM.  The Clearing Agreement, in relevant part, prohibited CIS from accepting funds for deposit or credit into any customer account and required CIS to instruct its customers to deposit funds directly with Peregrine.  From

approximately November 2006 through December 2008, Peregrine carried certain customer accounts introduced by CIS.

23.     Between May 2007 and October 2008, Ward, acting individually and as an agent for CIS, solicited two individuals and the Trans Global pool to invest at least $180,648 in commodity futures trading.  Those customers did not deposit their funds directly with Peregrine. Rather, upon instructions from Ward, those customers made their funds payable to CIS or Ward, and Ward deposited those funds into CIS's or his personal bank account.

24.     In May 2007, Ward orally solicited Conrad Gac ("Gac") to trade $25,000 with CIS.  Both verbally and in an email, Ward willfully or recklessly misrepresented to Gac that his funds would be traded by an experienced third-party trader at the Chicago Mercantile Exchange (the "CME") and such trading would yield a 38% annual rate of return.  Based on those representations, Gac gave Ward a $25,000 check payable to CIS, which Ward deposited into CIS's WaMu bank account.  In return, Gac received a one year promissory note from CIS that provided for 38% annual interest, but did not refer to commodity trading.  Over the next six months, CIS paid Gac $5,148 in purported interest on the promissory note.

25.     In December 2007, at Ward's suggestion, CIS and Gac cancelled the first promissory note and executed a new one year note in the amount of $50,000.  In connection with the second promissory note, Gac gave Ward an additional $20,648 check made payable to "Allen Ward," which Ward deposited into his personal bank account.  Ward again willfully misrepresented that the funds would be used by the third-party trader to trade commodity futures on the CME and such trading would yield a 38% percent annual rate of return.

8

26.     Rather than use Gac's funds to trade commodity futures, Ward and CIS misappropriated the remaining $40,500 and used those funds to pay CIS's operating costs and legal expenses, and/or Ward's personal uses, such as automobile expenses, residential rent, meals and entertainment.  Further, at no time did the aforementioned third-party trader trade commodity futures for Gac or for any account controlled by CIS or Ward.

27.     In October 2008, Ward solicited another person, Janina Clark ("Clark"), to trade commodity futures with CIS.  At that time, Clark was already a participant in the Trans Global pool.  Ward willfully or recklessly misrepresented to Clark that her funds would be traded in a commodity account managed and controlled by CIS.

28.     Based upon Ward's representations, on October 13, 2008, Clark gave Ward a check in the amount of $70,000, payable to him individually, for commodity futures trading. Rather than use Clark's funds for commodity trading, Ward deposited the check into his personal bank account and misappropriated the funds for payment of CIS's operating costs and legal expenses and/or Ward's personal uses, such as automobile expenses, residential rent, meals and entertainment.

29.     In November 2008 and January 2009, Ward willfully issued false written statements to Clark regarding the profitability and value of her investment.

**B.      The Trans Global Pool Enterprise and Solicitation of Pool Participants**

30.     In early 2007, Timberlake and Ward formed Trans Global for the sole purpose of operating the Trans Global pool.  They agreed that Ward would act as Trans Global's trading advisor and would assist Timberlake in trading on behalf of the pool.

31.     In March 2007, Timberlake opened a bank account in the name of Trans Global with Bank of America, N.A. ("BOA").  Timberlake has at all relevant times maintained exclusive control over the BOA account.

32.     Since approximately March 2007, Timberlake and Ward have solicited individuals located in Hawaii, California, Nevada, the United Kingdom, and other locations, to participate in the Trans Global pool through phone calls, emails, newsletters and individual meetings.  During those solicitations, Timberlake and/or Ward represented to prospective pool participants that funds invested in the Trans Global pool would be held in a segregated account and traded primarily in "commodities," and that pool participants should expect a solid, consistent return between 10% and 30% per year.

33.     Timberlake and Ward drafted and had most, if not all, pool participants execute the Trans Global Letter of Agreement (the "Trans Global Agreement").  The Trans Global Agreement states in part that participant funds will be "held [in] and traded" from a segregated account managed by Timberlake and Ward and cleared by Peregrine.

34.     The Trans Global Agreement also provides for a management fee of 35% of the profits in any given month, along with a monthly service fee of $100 per account commencing in January 2008.  It does not authorize the use of participant funds for any other expenses, fees and/or compensation.

35.     The Trans Global Agreement falsely states that Timberlake is registered with the Commission as a CPO, and is a member of the National Futures Association ("NFA").  In fact, Timberlake has never been registered with the Commission in any capacity and is not an NFA member.

36.     In March 2007, Timberlake opened a trading account on behalf of Trans Global at Peregrine (the "xx-x7104 Account"). In the account opening documents, dated February 27, 2007, Timberlake falsely represented that this was a "corporate account" that was "being traded with corporate funds only" and that Trans Global did not solicit customer funds. CIS acted as the IB and received commission payments for all trades executed on behalf of the account.

37.     Timberlake and Ward managed the xx-x7104 Account during its lifetime. Timberlake and Ward entered trade orders on behalf of Trans Global and used a shared login and password to access the xx-x7104 Account. Further, Timberlake and Ward each received or had access to statements from Peregrine that showed, among other things, all open positions, the net profit or loss resulting from trade, and the ending trade balance for the xx-x7104 Account.

38.     From May 2007 through the present, at least five individuals, excluding Timberlake and Ward, have participated in the Trans Global pool. The Trans Global pool includes at least $220,000 in participant contributions, exclusive of any contribution(s) by Ward and/or Timberlake. Participant funds have been used to trade various financial instruments including, but not limited to, commodity futures through at least two commodity trading accounts carried by Peregrine.

39.     Between June 2007 and January 2009, Timberlake caused $195,000 of participant funds to be deposited into the xx-x7104 Account and transferred $25,000 of participant funds directly to CIS. Timberlake also deposited at least $55,000 of his own money into the xx-x7104 Account prior to January 12, 2009.

40.     From June 5, 2007 through January 12, 2009, Timberlake and Ward collectively lost over $161,000, including commissions and fees, trading the xx-x7104 Account. Despite

11

these actual losses, in February 2008 and April 2008, Timberlake willfully issued false written statements to pool participants regarding the profitability and value of their respective shares of the Trans Global pool.  In November 2008 and January 2009, Ward willfully issued false written statements to at least one pool participant regarding the profitability and value of her respective share of the Trans Global pool.

41.     On or around June 26, 2007, Timberlake transferred $75,000 of Trans Global Pool participant funds from the xx-x7104 Account to a second Peregrine account (the "xx-x7108 Account"), also introduced by CIS but managed by Ace Capital Management, LLC ("Ace"), a registered CTA, and its associated person.  Between June 26, 2007 and October 22, 2007, Ace acted as a CTA and entered trade orders on behalf of the xx-x7108 Account.

42.     Between June 26, 2007 and August 31, 2007, the xx-x7108 Account lost over $5,600, including commissions and fees.  Despite these actual losses, in September 2007, Timberlake issued a false written statement to at least one pool participant regarding the profitability and value of the participant's share of the xx-x7108 Account.

43.     Between at least June and September 2007, Timberlake, acting individually and on behalf of Trans Global, transferred at least $65,000 of Trans Global pool funds to CIS for trading commodity futures on behalf of Trans Global.  These transfers included $25,000 of pool funds from Trans Global's bank account to CIS in June 2007 described in paragraph 39 and an additional $40,000 of pool funds from the xx-x7108 Account to CIS in September 2007.  In both instances, the pool funds were transferred into a non-segregated account and used for purposes other than commodity futures trading.

44.     Timberlake and Ward orally agreed that CIS and Ward would manage the pool funds described in paragraph 43, which Ward represented would result in an annual return of at least 35%.  Timberlake failed to confirm with Ward or CIS or otherwise verify that the Trans Global funds were being used to trade commodity futures.  Nevertheless, Timberlake later reported to pool participants that they had received a 40% minimum return on the $65,000 investment.

45.     Both Timberlake and Ward reported to pool participants that the $65,000 had been invested in commodity futures.  In fact, Ward and CIS misappropriated and used the $65,000 for CIS's operating expenses and legal fees and/or Ward's personal uses, such as automobile expenses, residential rent, meals and entertainment.

46.     In summary, between November 2006 and February 2009, Ward, acting individually and on behalf of CIS, misappropriated at least $175,500 in customer funds (which includes $65,000 of Trans Global pool funds misappropriated by Ward and Timberlake) by depositing such funds in bank accounts that he controlled and using those funds as described in paragraphs 26, 28 and 45 above.

## VI.     VIOLATIONS OF THE COMMODITY EXCHANGE ACT AND COMMISION REGULATIONS

### Count I

### Violations of Section 4b(a)(2)(i), (iii) of the Act and Section 4b(a)(1)(A), (C) of the Act, as amended: Fraud by Misappropriation and Misrepresentations by CIS and Ward

47.     Paragraphs 1 through 46 are realleged and incorporated herein by reference.

48.     Prior to being amended by the CRA, Section 4b(a)(2)(i), (iii) of the Act, 7 U.S.C. § 6b(a)(2)(i), (iii) (2006), made it unlawful for any person to: (i) cheat or defraud or attempt to

cheat or defraud; or (iii) willfully to deceive or attempt to deceive by any means whatsoever other persons, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery made, or to be made, for or on behalf of such other persons if such contract for future delivery is or may be used for (A) hedging any transaction in interstate commerce in such commodity, or the products or byproducts thereof, or (B) determining the price basis of any transaction in interstate commerce in such commodity, or (C) delivering any such commodity sold, shipped or received in interstate commerce for the fulfillment thereof, in connection with acts occurring before June 18, 2008.

49.     Similarly, Section 4b(a)(1)(A), (C) of the Act, as amended, to be codified at 7 U.S.C. § 6b(a)(1)(A), (C), makes it unlawful for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity in interstate commerce or for future delivery that is made, or to be made, on or subject to the rules of a designated contract market, for or on behalf of any other person: (A) to cheat or defraud or attempt to cheat or defraud such other person; or (C) willfully to deceive or attempt to deceive such other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contract for such other person, in connection with acts occurring on or after June 18, 2008.

50.     As set forth above, from at least November 2006 through at least February 2009, defendants CIS, by and through Ward, and Ward cheated, defrauded or deceived, and/or attempted to cheat, defraud or deceive their customers by, among other things:

(a) knowingly or recklessly making false representations of material fact to prospective customers and customers, including that:

14

(i) customer funds deposited with CIS would be used to trade commodities; and

(ii) an experienced third-party trader would trade the funds; and

(b) misappropriating customer funds.

51.     By this conduct, defendants CIS, by and through Ward, and Ward violated Section 4b(a)(2)(i), (iii) of the Act, 7 U.S.C. § 6b(a)(2)(i), (iii) (2006), with respect to conduct before June 18, 2008, and Section 4b(a)(1)(A), (C) of the Act, as amended, to be codified at 7 U.S.C. § 6b(a)(1)(A), (C), with respect to conduct on or after June 18, 2008.

52.     Ward, and CIS, by and through Ward, engaged in the acts and practices described above knowingly or with reckless disregard for the truth.

53.     Ward's acts, omissions and failures, as described in this Count One, were committed within the scope of his employment with CIS.  Therefore, CIS is liable for his acts, omissions and failures pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2006), and Commission Regulation 1.2, 17 C.F.R. § 1.2 (2011).

54.     During all relevant times, Ward directly or indirectly controlled CIS, and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting CIS's violations described in this Count One.  Pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2006), Ward is therefore liable for CIS's violations described in this Count One to the same extent as CIS.

55.     Each misappropriation of funds and each misrepresentation of material fact, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Section 4b(a)(2)(i), (iii) of the Act, 7 U.S.C. § 6b(a)(2)(i), (iii) (2006), with respect

to acts before June 18, 2008, and Section 4b(a)(1)(A), (C) of the Act, as amended, to be codified at 7 U.S.C. § 6b(a)(1)(A), (C), with respect to acts on or after June 18, 2008.

## Count II

### Violations of Section 4b(a)(2)(ii) of the Act and Section 4b(a)(1)(B) of the Act, as amended: Fraud by False Statements by CIS and Ward

56.    Paragraphs 1 through 46 are realleged and incorporated herein by reference.

57.    Prior to being amended by the CRA, Section 4b(a)(2)(ii) of the Act, 7 U.S.C. § 6b(a)(2)(ii) (2006), made it unlawful for any person to willfully to make or cause to be made to other persons any false report or statement, or willfully to enter or cause to be entered for other persons any false record, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery made, or to be made, for or on behalf of such other persons if such contract for future delivery is or may be used for: (A) hedging any transaction in interstate commerce in such commodity, or the products or byproducts thereof, or (B) determining the price basis of any transaction in interstate commerce in such commodity, or (C) delivering any such commodity sold, shipped or received in interstate commerce for the fulfillment thereof, in connection with acts occurring before June 18, 2008.

58.    Similarly, Section 4b(a)(1)(B) of the Act, as amended, to be codified at 7 U.S.C. § 6b(a)(1)(B), makes it unlawful for any person, in or in connection with any contract of sale of any commodity for future delivery or other agreement, contract or transaction "willfully to make or cause to be made to the other person any false report or statement or willfully to enter or cause to be entered for the other person any false record" in connection with acts occurring on or after June 18, 2008.

16

59.     As set forth above, in November 2008 and January 2009, defendants CIS, by and through Ward, and Ward willfully caused false written statements to be made to at least one CIS customer concerning the profitability and value of her investments.

60.     Ward, and CIS, by and through Ward, engaged in the acts and practices described above knowingly or with reckless disregard for the truth.

61.     By this conduct, Ward and CIS, by and through Ward, violated Section 4b(a)(2)(ii) of the Act, 7 U.S.C. §6b(a)(2)(ii) (2006), with respect to acts before June 18, 2008, and Section 4b(a)(1)(B) of the Act, as amended, to be codified at 7 U.S.C. § 6b(a)(1)(B) with respect to acts on or after June 18, 2008.

62.     Ward's acts, omissions and failures, as described in this Count Two, were committed within the scope of his employment or office with CIS.  Therefore, CIS is liable for his acts, omissions and failures pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2006), and Regulation 1.2, 17 C.F.R. § 1.2 (2011).

63.     During all relevant times, Ward directly or indirectly controlled CIS, and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting CIS's violations described in this Count Two.  Pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2006), Ward is therefore liable for CIS's violations described in this Count Two to the same extent as CIS.

64.     Each false periodic statement or report, including without limitation those specifically alleged herein, is alleged as a separate and distinct violation of Section 4b(a)(2)(ii) of the Act, 7 U.S.C. § 6b(a)(2)(ii) (2006), with respect to acts occurring before June 18, 2008, and

of Section 4b(a)(1)(B) of the Act, as amended, to be codified at 7 U.S.C. § 6b(a)(1)(B), with respect to acts occurring on or after June 18, 2008.

## Count III

### Violations of Section 4b(a)(2)(i), (iii) of the Act and Section 4b(a)(1)(A), (C) of the Act, as amended: Fraud by Misrepresentation by Trans Global, Timberlake and Ward

65.     Paragraphs 1 through 46 are realleged and incorporated herein by reference.

66.     Regarding the Trans Global pool's trading in commodity futures, Section 4b(a)(2)(i), (iii) of the Act, 7 U.S.C. § 6b(a)(2)(i), (iii) (2006), prior to being amended by the CRA, made it unlawful for any person to: (i) cheat or defraud or attempt to cheat or defraud; or (iii) willfully to deceive or attempt to deceive by any means whatsoever other persons, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery made, or to be made, for or on behalf of such other persons if such contract for future delivery is or may be used for (A) hedging any transaction in interstate commerce in such commodity, or the products or byproducts thereof, or (B) determining the price basis of any transaction in interstate commerce in such commodity, or (C) delivering any such commodity sold, shipped or received in interstate commerce for the fulfillment thereof, in connection with acts occurring before June 18, 2008.

67.     Similarly, Section 4b(a)(1)(A), (C) of the Act, as amended, to be codified at 7 U.S.C. § 6b(a)(1)(A), (C), make it unlawful for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity in interstate commerce or for future delivery that is made, or to be made, on or subject to the rules of a designated contract market, for or on behalf of any other person: (A) to cheat or defraud or attempt to cheat or

defraud such other person; or (C) willfully to deceive or attempt to deceive such other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contract for such other person, in connection with acts occurring on or after June 18, 2008.

68.     As set forth above, from at least March 2007 through the present, defendants Trans Global (by and through Timberlake and Ward), Timberlake and Ward have cheated, defrauded or deceived, and/or attempted to cheat, defraud or deceive, pool participants and prospective participants by, among other things willfully or recklessly making false representations of material fact, including that:

(a) Timberlake and/or Trans Global was registered with the Commission; and

(b) pool funds would be held and traded from a segregated Peregrine account.

69.     Trans Global (by and through Timberlake and Ward), Timberlake and Ward engaged in the acts and practices described above knowingly or with reckless disregard for the truth.

70.     By this conduct, Trans Global (by and through Timberlake and Ward), Timberlake and Ward violated Section 4b(a)(2)(i), (iii), 7 U.S.C. § 6b(a)(2)(i), (iii) (2006), with respect to acts before June 18, 2008, and Section 4b(a)(1)(A), (C) of the Act, as amended, to be codified at 7 U.S.C. § 6b(a)(1)(A), (C) with respect to acts on or after June 18, 2008.

71.     The acts, omissions and failures of Timberlake and Ward, as described in this Count Three, were committed within the scope of their employment or association with Trans Global. Therefore, Trans Global is liable for their acts, omissions and failures pursuant to

Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2006), and Commission Regulation 1.2, 17 C.F.R. § 1.2 (2011).

72.     During all relevant times, Timberlake and Ward directly or indirectly controlled Trans Global, and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting Trans Global's violations described in this Count Three.  Pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2006), Timberlake and Ward are therefore liable for Trans Global's violations described in this Count Three to the same extent as Trans Global.

73.     Each misrepresentation or omission of material fact, including without limitation those specifically alleged herein, is alleged as a separate and distinct violation of Section 4b(a)(2)(i), (iii) of the Act, 7 U.S.C. § 6b(a)(2)(i), (iii) (2006), with respect to acts before June 18, 2008, and as a violation of Section 4b(a)(1)(A), (C) of the Act, as amended, to be codified at 7 U.S.C. § 6b(a)(1)(A), (C), with respect to acts on or after June 18, 2008.

**Count IV**

**Violations of Section 4b(a)(2)(ii) of the Act and
Section 4b(a)(1)(B) of the Act, as amended:
Fraud by False Statements by Trans Global,
Timberlake and Ward**

74.     Paragraphs 1 through 46 are realleged and incorporated herein by reference.

75.     Prior to being amended by the CRA, Section 4b(a)(2)(ii) of the Act, 7 U.S.C. § 6b(a)(2)(ii) (2006), made it unlawful for any person willfully to make or cause to be made to other persons any false report or statement, or willfully to enter or cause to be entered for other persons any false record, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery made, or to be made, for or on behalf of such other persons if such contract for future delivery is or may be used for: (A) hedging any

20

transaction in interstate commerce in such commodity, or the products or byproducts thereof, or (B) determining the price basis of any transaction in interstate commerce in such commodity, or (C) delivering any such commodity sold, shipped or received in interstate commerce for the fulfillment thereof, in connection with acts occurring before June 18, 2008.

76.     Similarly, Section 4b(a)(1)(B) of the Act, as amended, to be codified at 7 U.S.C. § 6b(a)(1)(B), makes it unlawful for any person, in or in connection with any contract of sale of any commodity for future delivery or other agreement, contract or transaction "willfully to make or cause to be made to the other person any false report or statement or willfully to enter or cause to be entered for the other person any false record" in connection with acts occurring on or after June 18, 2008.

77.     As set forth above, from at least September 2007 through January 2009 defendants Trans Global (by and through Timberlake and Ward), Timberlake and Ward knowingly caused false written statements to be made to pool participants concerning the profitability and value of their shares of the Trans Global pool.

78.     Trans Global (by and through Timberlake and Ward), Timberlake and Ward engaged in the acts and practices described above knowingly or with reckless disregard for the truth.

79.     By the conduct set forth in this count, Trans Global (by and through Timberlake and Ward), Timberlake and Ward violated Section 4b(a)(2)(ii), 7 U.S.C. § 6b(a)(2)(ii) (2006), with respect to acts before June 18, 2008, and Section 4b(a)(1)(B) of the Act, as amended, to be codified at 7 U.S.C. § 6b(a)(1)(B) with respect to acts on or after June 18, 2008.

80. ' The acts, omissions and failures of Timberlake and Ward, as described in this Count Four, were committed within the scope of their employment or association with Trans Global. Therefore, Trans Global is liable for their acts, omissions and failures pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2006), and Commission Regulation 1.2, 17 C.F.R. § 1.2 (2011).

81. During all relevant times, Timberlake and Ward directly or indirectly controlled Trans Global, and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting Trans Global's violations described in this Count Four. Pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2006), Timberlake and Ward are therefore liable for Trans Global's violations described in this Count Four to the same extent as Trans Global.

82. Each false statement or report, including without limitation those specifically alleged herein, is alleged as a separate and distinct violation of Section 4b(a)(2)(ii) of the Act, 7 U.S.C. § 6b(a)(2)(ii) (2006), with respect to acts occurring before June 18, 2008, and of Section 4b(a)(1)(B) of the Act, as amended, to be codified at 7 U.S.C. § 6b(a)(1)(B), with respect to acts occurring on or after June 18, 2008.

### Count V
### Violations of Section 4*o*(1)(A), (B) of the Act:
### Fraud by a CPO, Trans Global, and APs of a CPO,
### Timberlake and Ward

83. Paragraphs 1 through 46 are realleged and incorporated herein by reference.

84. Section 4*o*(1)(A), (B) of the Act, 7 U.S.C. § 6*o*(1)(A), (B) (2006), in relevant part, makes it unlawful for any commodity trading advisor, commodity pool operator, or associated person directly or indirectly "to employ any device, scheme, or artifice to defraud any client or participant or prospective client or participant" or "to engage in any transaction, practice, or

22

course of business which operates as a fraud of deceit upon any client or participant or prospective client or participant."

85. During all relevant times, Trans Global acted as a CPO by engaging in a business that is the nature of an investment trust, syndicate or similar form of enterprise and by soliciting, accepting and receiving from others funds, securities and/or property for the purpose of trading commodities.

86. As set forth above, Trans Global, acting as a CPO, and Timberlake and Ward, each acting on behalf of and as AP's of Trans Global, violated Section 4o(1) (A), (B) of the Act, 7 U.S.C. § 6o(1) (A), (B) (2006), by, among other things:

(a) knowingly or recklessly making false representations of material fact to pool participants, including that:

(i) Timberlake and/or Trans Global was registered with the Commission; and

(ii) participant funds would be held and traded from a segregated commodities account with Peregrine; and

(b) causing false written periodic statements to be made to pool participants concerning the profitability and value of their shares of the Trans Global pool.

87. Trans Global (by and through Timberlake and Ward), Timberlake and Ward engaged in the acts and practices described above knowingly or with reckless disregard for the truth.

88. The aforementioned uses of mails or other instrumentalities of interstate commerce include, but are not limited to: (1) making wire transfers between Trans Global's BOA bank account in Texas and other accounts located in Nevada, California and Hawaii; and

(2) using e-mail to send investment solicitations, account statements, and/or investor newsletters from Texas and/or Nevada to participants in Hawaii, California, Nevada, and the United Kingdom.

89.     By the conduct set forth in this count, Trans Global (by and through Timberlake and Ward), Timberlake and Ward violated Section 4*o*(1)(A), (B) of the Act, 7 U.S.C. § 6*o*(1)(A), (B) (2006).

90.     The acts, omissions and failures of Timberlake and Ward, as described in this Count Five, were committed within the scope of their employment or association with Trans Global.  Therefore, Trans Global is liable for their acts, omissions and failures pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2006), and Commission Regulation 1.2, 17 C.F.R. § 1.2 (2011).

91.     During all relevant times, Timberlake and Ward directly or indirectly controlled Trans Global, and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting Trans Global's violations described in this Count Five.  Pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2006), Timberlake and Ward are therefore liable for Trans Global's violations described in this Count Five to the same extent as Trans Global.

92.     Each misrepresentation or omission of material fact, including without limitation those specifically alleged herein, is alleged as a separate and distinct violation of Section 4*o*(1) (A), (B) of the Act, 7 U.S.C. § 6o(1)(A), (B) (2006).

### Count VI

### Violations of Regulation 1.57(c):
### Acceptance of Funds for Commodity
### Trading by a Registered IB, CIS

93.     Paragraphs 1 through 46 are realleged and incorporated herein by reference.

94.     Regulation 1.57(c), 17 C.F.R. § 1.57(c) (2011), provides in part, with certain limited exceptions not met within this case, that "[a]n introducing broker may not accept any money, securities or property (or extend credit in lieu thereof) to margin, guarantee or secure any trades or contracts of customers or option customers, or any money, securities or property accruing as a result of such trades or contracts."

95.     Between May 2007 and October 2008, CIS, a registered IB, though its agent Ward, directly accepted at least $180,648 from customers for the purpose of commodity trading.

96.     The acts, omissions and failures of Ward, as described in this Count Six, were committed within the scope of his employment or association with CIS.  Therefore, CIS is liable for his acts, omissions and failures pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2006), and Commission Regulation 1.2, 17 C.F.R. § 1.2 (2011).

97.     During all relevant times, Ward, directly or indirectly, controlled CIS and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting CIS's violations alleged in Count Six.  Ward is therefore liable for CIS's violations described in this Count Six to the same extent as CIS pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2006).

98.     Each occasion that CIS and Ward directly accepted funds from customers for the purpose of commodity is alleged as a separate and distinct violation of Regulation 1.57(c), 17 C.F.R. §1.57(c) (2011).

## VII.   RELIEF REQUESTED

WHEREFORE, for the reasons stated above, the Commission respectfully requests that this Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-1 (2006), and pursuant to its own equitable powers:

A.     Find defendants CIS and Ward liable for violating Section 4b(a)(2)(i)-(iii) of the Act, 7 U.S.C. § 6b(a)(2)(i)-(iii) (2006), with respect to acts occurring before June 18, 2008; Section 4b(a)(1)(A)-(C) of the Act, as amended, to be codified at 7 U.S.C. § 6b(a)(1)(A)-(C), with respect to acts occurring on or after June 18, 2008; and Regulation 1.57 (c), 17 C.F.R. §1.57(c)(2011).

B.     Find defendants Trans Global, Timberlake and Ward liable for violating Section 4b(a)(2)(i)-(iii) of the Act, 7 U.S.C. § 6b(a)(2)(i)-(iii) (2006), with respect to acts occurring before June 18, 2008; Section 4b(a)(1)(A)-(C) of the Act, as amended, to be codified at 7 U.S.C. § 6b(a)(1)(A)-(C), with respect to acts occurring on or after June 18, 2008, and Section 4o(1) (A), (B) of the Act, 7 U.S.C. § 6o(1) (A), (B).

C.     Enter a statutory restraining order with notice and/or order of preliminary injunction pursuant to Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a) (2006), restraining defendants CIS, Ward, Trans Global and Timberlake, and all persons insofar as they are acting in the capacity of defendants' agents, servants, successors, employees, assigns and attorneys, and

26

all persons insofar as they are acting in active concert or participation with defendants who receive actual notice of such order by personal service or otherwise, from directly or indirectly:

1.  withdrawing, transferring, removing, dissipating, concealing or disposing of, in any manner, any funds, assets or other property, wherever situated, including, but not limited to, all funds, personal property, money or securities held in safes or safety deposit boxes and all funds on deposit in any financial institution, bank or savings and loan account held by, under the actual or constructive control of or in the name of CIS, Trans Global, Ward and/or Timberlake;

2.  destroying, mutilating, concealing, altering or disposing of any books and records, documents, correspondence, brochures, manuals, electronically stored data, tape records or other property of defendants, wherever located, including all such records concerning defendants' business operations; and

3.  refusing to permit authorized representatives of the Commission to inspect, when and as requested, any books and records, documents, correspondence, brochures, manuals, electronically stored data, tape records or other property of defendants, wherever located, including all such records concerning defendants' business operations.

D.     Enter orders of preliminary and permanent injunction prohibiting defendants CIS, Ward, Trans Global and Timberlake, along with any of their affiliates, agents, servants, employees, successors, assigns, attorneys and persons in active concert with them who receive actual notice of such order by personal service or otherwise, from:

27

1.  engaging in conduct in violation of Section 4b(a)(1)(A)-(C) of the Act, as
    amended, to be codified at 7 U.S.C. § 6b(a)(1)(A)-(C), and Section 4o(1) (A),
    (B) of the Act, 7 U.S.C. § 6o(1)(A), (B), and further prohibiting defendants
    CIS and Ward, along with any of their affiliates, agents, servants, employees,
    successors, assigns, attorneys and persons in active concert with them who
    receive actual notice of such order by personal service or otherwise, from
    engaging in conduct in violation Regulation 1.57 (c), 17 C.F.R. § 1.57(c)
    (2011);

2.  trading on or subject to the rules of any registered entity, as that term is
    defined in Section 1a of the Act, as amended, to be codified at 7 U.S.C. § 1a;

3.  entering into any transactions involving commodity futures, options on
    commodity futures, commodity options as that term is defined in Commission
    Regulation 32.1(b)(1), 17 C.F.R. § 32.1(b)(1) (2011) ("commodity options"),
    swaps and/or foreign currency as described in Sections 2(c)(2)(B) and
    2(c)(2)(C)(i) of the Act, as amended, to be codified at 7 U.S.C. §§ 2(c)(2)(B)
    and 2(c)(2)(C)(i) ("forex contracts") for their own personal account or for any
    account in which they have a direct or indirect interest;

4.  having any commodity futures, options on commodity futures, commodity
    options, swaps and/or forex contracts traded on their behalf;

5.  controlling or directing the trading for or on behalf of any other person or
    entity, whether by power of attorney or otherwise, in any account involving

commodity futures, options on commodity futures, commodity options,

swaps, and/or forex contracts;

6. soliciting, receiving, or accepting any funds from any person for the purpose

of purchasing or selling any commodity futures, options on commodity

futures, commodity options, swap, and/or forex contracts;

7. applying for registration or claiming exemption from registration with the

Commission in any capacity, and engaging in any activity requiring such

registration or exemption from registration with the Commission, except as

provided for in Commission Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9)

(2011); and

8. acting as a principal (as that term is defined in Commission Regulation 3.1(a),

17 C.F.R. § 3.1(a) (2011)), agent or any other officer or employee of any

person or entity registered, exempted from registration or required to be

registered with the Commission, except as provided for in Commission

Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2011).

E.     Enter an order directing that defendants make an accounting to the Court within

thirty (30) days of the date of the Court's order of all of defendants' assets and liabilities,

together with all funds defendants received from and paid to Trans Global pool participants, CIS

customers, investors and/or other persons in connection with commodity futures and options

transactions or purported commodity futures and options transactions, including the names,

mailing addresses, email addresses and telephone numbers of any such persons from whom they

received such funds from November 2006 to the date of such accounting, and all disbursements

for any purpose whatsoever of funds received from Trans Global pool participants, CIS customers, investors and/or other persons including salaries, commissions, fees, loans and other disbursements of money and property of any kind, from November 2006 to and including the date of such accounting.

F.      Enter an order directing defendants CIS, Ward, Trans Global and Timberlake to make restitution by making whole each and every CIS customer whose funds were received or used by them in violation of the provisions of the Act as described herein, including pre- and post-judgment interest.

G.      Enter an order directing defendants CIS, Ward, Trans Global and Timberlake, as well as any successors and/or agents of defendants, to disgorge, pursuant to such procedure as the Court may order, all benefits received from the acts or practices that constitute violations of the Act, as described herein, and pre- and post-judgment interest thereon from the date of such violations.

H.      Enter an order directing defendants to pay civil monetary penalties to be assessed by the Court separately against each of them, in amounts not more than the greater of: (1) $130,000 for each violation occurring from October 23, 2004 through October 22, 2008 and $140,000 for each violation occurring after October 22, 2008 or (2) triple the monetary gain to defendants for each violation of the Act.

I.      Enter an order directing defendants, and any successors thereof, to rescind, pursuant to such procedures as the Court may order, all contracts and agreements, whether implied or express, entered into between them and any of the participants or customers whose

WHEREFORE, the Commission respectfully requests that this Court enter a Statutory Restraining with Notice.  A proposed Statutory Restraining Order accompanies this Motion.

Date: June 29, 2011                                    Respectfully submitted,

                                                       *Elizabeth M. Pendleton*
                                                       Elizabeth N. Pendleton
                                                       Commodity Futures Trading Commission
                                                       525 West Monroe Street, Suite 1100
                                                       Chicago, Illinois 60661
                                                       (312) 596-0629
                                                       ependleton@cftc.gov

                                                       One of the Attorneys for Plaintiff